UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 17-CV-22529

GARY EUGENE,

       Plaintiff,

vs.

CITY OF NORTH MIAMI,
LARRY M. SPRING, JR., and
SCOTT W. GALVIN,

       Defendants.

_____/

## COMPLAINT

Plaintiff, Gary Eugene, brings this action to remedy address the conduct by Defendants, City of North Miami, Larry M. Spring, Jr., and Scott W. Galvin, by seeking reinstatement, damages, and other relief based on the following:

### Parties, Jurisdiction, and Venue

1. **Plaintiff, Gary Eugene**, was and is a resident of Broward County, at all times material, and he is *sui juris*.

2. **Defendant, City of North Miami**, is a municipality within Miami-Dade County, Florida, and it is *sui juris*.

3. **Defendant, Larry M. Spring, Jr.**, was at all times material over 18 years old, *sui juris*, and the City Manager for the City of North Miami.

4. **Defendant, Scott W. Galvin**, was at all times material over 18 years old, *sui juris*, and a resident of Miami-Dade County, Florida. Mr. Galvin also served as a member of the City of North Miami City Council at all times material hereto.

1

5.      This Court has original jurisdiction over Chief Eugene's claims that arise under federal law and supplemental / pendent jurisdiction over his related state law claim(s).

6.      Venue is proper pursuant to 28 U.S.C. §1391(b)(ii) because the Defendant municipality is located within this District, because the Defendant municipality employed Chief Eugene in this District, because Defendant Spring made adverse employment decisions in this District, because Defendant Galvin made disparaging statements in this District, and because most of the actions complained of occurred within this District.

### *Background Facts*

#### *About Gary Eugene*

7.      Chief Eugene was born in Haiti and became a police officer with the City of Miami in 1985.

8.      Chief Eugene embarked on a distinguished career over the next thirty years working as a public servant for the City of Miami Police Department.

9.      While amassing an unblemished employment record with the City of Miami Police Department, Chief Eugene ascended through its ranks.

10.      Chief Eugene became the first Haitian-born Lieutenant within the City of Miami in 1996, and served the Little Haiti community.

11.      The City of Miami Police Department later promoted Chief Eugene to the rank of Captain in, and he then served the Liberty City community.

12.      In 2003, the City of Miami Police Department appointed Chief Eugene to the rank of Commander, overseeing the Little Haiti Community and subsequently the emergency operations of the Communications Section.

13.      Chief Eugene then joined the City of North Miami Police Department in 2013 and

2

was appointed to the position of Assistant Chief on December 28, 2015.

14.     Chief Eugene never ceased in his formal education during his career. Chief Eugene earned a Master's Degree in Criminal Justice from Florida International University, a Bachelor's Degree in Liberal Studies from Barry University, and an Associate's Degree in Criminal Justice from Miami-Dade College.

15.     Chief Eugene also is a graduate of the prestigious Southern Police Institute (S.P.I.) in Louisville, Kentucky, and the Senior Management Institute for Police Executives (S.M.I.P.) at the University of Boston (taught by professors from Harvard's Kennedy School.)

16.     The City of North Miami appointed Chief Eugene to serve as its Chief of Police on an interim basis in 2016 and then formally appointed him as its Chief of Police, which appointment became official effective on July 12, 2016.

17.     The City of North Miami appointed Chief Eugene to this position, such that he served as the only Haitian-American Chief of Police in South Florida.

*About the Unfortunate Shooting of Charles Kinsey*

18.     On Monday, July 18, 2016 at approximately 5:00 p.m., the City of North Miami Police was advised by way of the Miami-Dade 911 operator that a gentlemen was in the area of 14th Avenue and N.E. 127th Street with what appeared to be a gun to his head, and that another gentleman was trying to talk him out of "it".

19.     The 911 caller described the person who later been identified as Arnaldo Rios-Soto, an autistic adult.

20.     The gentleman whom the caller described as with Mr. Soto was identified as Charles Kinsey, who was taking care of Mr. Soto.

21.     The Miami-Dade Police Dispatcher advised the units that a Latin male with grey

3

pants and white shirt (Mr. Soto) had a gun to his head.

22.     Commander Emile Hollant set up approximately 170 feet away from where Mssrs. Soto and Kinsey were located. Commander Hollant first advised over the radio that Mr. Soto appeared to be loading his weapon and then confirmed his suspicions over the radio.

23.     Shortly thereafter, one of the officers who had taken cover approximately 25 feet from where Mssrs. Soto and Kinsey were located, Officer Bernadeau, announced over the radio to the dispatcher (and all officers) that Mr. Kinsey advised that Mr. Soto was not holding a gun, but "a toy car".

24.     Another officer then announced over the radio that, "I have a visual. Does not appear to be a firearm. **Have units QRX** (stand down)."

25.     The Dispatcher next instructed all North Miami Police Officers: "**All units QRX** (stand down)."

26.     Around this time, but before any shots were fired, Commander Hollant had left his cover position approximately 170 feet away so that he could retrieve his binoculars from his police vehicle to identify the object in Mr. Soto's hand.

27.     Several officers then began to emerge from their protected positions based on the confirmation that Mr. Soto was holding "a toy car".

28.     Before Commander Hollant could return to visualize the object in Mr. Soto's hands through his binoculars, Officer Aledda fired three shots: one buzzed by Mr. Kinsey's ear, one just missed a fellow officer who had left his cover position, and the third struck Mr. Kinsey in the leg.

29.     Commander Hollant then announced, "400, shots fired", over the radio.

30.     The North Miami Police Department then placed Mr. Kinsey in handcuffs and

4

questioned him, with a bullet still lodged in his leg, bleeding.

<em>The Investigations</em>

31.     Chief Eugene commenced a debriefing after the shooting.

32.     As part of this debriefing process, Chief Eugene invited Commander Hollant to participate, so long as he did not witness the shooting.

33.     Commander Hollant responded to Chief Eugene that he (Commander Hollant) did not witness the shooting.

34.     Chief Eugene thereafter invited the Florida Department of Law Enforcement ("FDLE") to conduct an investigation into the circumstances surrounding the shooting of Mr. Kinsey.

35.     Chief Eugene invited FDLE to conduct the investigation to avoid any appearance of impropriety during the North Miami Police Department's investigation.

36.     Chief Eugene gave a statement on July 28, 2016 in which he criticized the City of North Miami Police Department's training, procedures, and internal processes.

37.     Assistant Chief of Police Larry Juriga informed Chief Eugene that he (Assistant Chief Juriga) had listened to the recording of the audio transmissions from July 18, 2016, that Commander Hollant was a witness to the shooting, that Commander Hollant had made a statement which probably caused Officer Aledda to open fire, and that Commander Hollant had lied.

38.     Chief Eugene accepted Assistant Chief Juriga's statements as true and recommended to City Manager Springs that Commander Hollant be suspended *without* pay in the presence of the City Attorney, Jeff Cazeau, Esq., and North Miami Police Department Public Information Officer ("PIO") Natalie Buissereth.

5

39.     Chief Eugene then thought about the situation further and decided to listen to the radio transmissions that transpired on the evening of July 18, 2016 for himself.

40.     Chief Eugene concluded from his listening of the radio transmissions that **Commander Hollant did not lie**, and so recommended to City Manager Spring, in the presence of City Attorney Jeff Cazeau, Esq., that no disciplinary actions shall be taken against Commander Hollant.

41.     Chief Eugene further recommended that City Manager Spring listen to the audio transmissions from the July 18, 2016, incident.

42.     City Manager Spring refused and directed Chief Eugene to relieve Commander Hollant of duty, without pay.

43.     The Miami-Dade State Attorneys' Office also commended an investigation to determine, among other things, whether Commander Hollant lied or committed any other criminal offense such as perjury.

44.     The Miami-Dade State Attorneys' Office took sworn statements from Commander Hollant and from Chief Eugene, amongst others.

45.     The Miami-Dade State Attorneys' Office completed its investigation into Commander Hollant and, subsequently concluded that, "**Commander Hollant did not lie and that there was no intent by Commander Hollant to mislead or obstruct investigators or command staff**" when he related that he was not a witness to the shooting, and that any discrepancy was the result of a "miscommunication".

46.     Chief Eugene objected to the City of North Miami and to City Manager Spring hiring a consultant to assist with the IA investigation, but City Manager Spring advised that the consultant's job was to review the existing policies of the department and to make

6

recommendations, if necessary.

47.     Chief Eugene also brought to the attention of the City Manager that PERF was also scheduled to review the existing policies of the department and that the hiring of the consultant and PERF together amounted to gross financial waste and that spending money on both PERF and the consultant was unnecessarily duplicative and a gross waste of public funds.

48.     When Chief Eugene realized that the consultant was actually involved in the questioning of the witnesses of the police shooting in connection with the IA investigation involving Commander Hollant, Chief Eugene once again brought his concerns and objection to the Deputy City Attorney, Jenifer Warren.

49.     Chief Eugene's objection was (a) against changing the IA investigation process in the midst of the ongoing IA investigation involving Commander Hollant and (b) to the Defendant City engaging in gross financial waste. The Defendant City did not heed Chief Eugene's concerns and ignored his objections.

50.     Later, Chief Eugene gave a statement to the Internal Affairs investigator for the City of North Miami Police Department as part of its investigation into Commander Hollant.

51.     After concluding his sworn statement, Chief Eugene specifically requested to the Internal Affairs investigator that he have the ability to review the transcribed statement for its accuracy, due to his accent, prior to finalizing it.

52.     The Defendant City sent an audio recording of Chief Eugene's statement to Net Transcripts, Inc., for transcription.

53.     The Defendant City then received Chief Eugene's transcribed statement back, but never gave Chief Eugene the ability to review the transcription of his statement to correct anything improperly transcribed, which is why it remains rife with errors and omissions.

7

54.     Meanwhile, the City of North Miami Police Department provided copies of the Internal Affairs statements it had to the Miami-Dade State Attorney's Office. Personnel from the City of North Miami Police Department met with the Assistant State Attorney without Chief Eugene's knowledge in an effort to convince the Miami-Dade State Attorney's Office's to change its conclusion(s) about Commander Hollant.

55.     On April 14, 2017, the Miami-Dade State Attorney's Office responded that it had reviewed the statements it took and those taken by the City of North Miami Police Department and declined to amend the Preliminary Inquiry Close-Out Memo (finding that Commander Hollant did not lie, and did not intend to mislead or obstruct investigators or command staff).

*Gary Eugene Takes An Approved Medical Leave Of Absence*

56.     Chief Eugene scheduled a medical procedure, and so he made preparations for his absence.

57.     Chief Eugene completed all necessary paperwork for his leave, and the Defendant City approved Chief's Eugene medical leave pursuant to the Family and Medical Leave Act, 29 U.S.C. §2601, *et seq.* ("FMLA").

58.     Chief Eugene proposed to the Defendant City and to City Manager Spring that each of his Assistant Chiefs will alternately assume the position of Acting Chief of Police during his scheduled absence, but City Manager Spring told Chief Eugene that he only wanted one acting Chief of Police – and not Assistant Chief Cuevas – leaving Assistant Chief Larry Juriga as the acting Chief of Police.

59.     As part of his preparations, Chief Eugene advised Assistant Chief Juriga, who would be acting as the Chief of Police during Chief Eugene's absence, to not take any major decisions and to call Chief Eugene before making any such decisions, especially the Internal

8

Affairs investigation of Commander Hollant – which Chief Eugene made clear that he wanted to review and decide for himself.

60.     Chief Eugene made this instruction so that he could review all of the Internal Affairs investigative documents before arriving at a disposition and deciding whether to take any action against Commander Hollant and, if so, the extent of such action.

61.     Chief Eugene began his approved FMLA leave of absence from his position on Saturday, May 6, 2017.

62.     On June 2, 2017, **Assistant Chief Neil Cuevas** issued a memorandum to Police Chief Gary Eugene regarding the Internal Affairs investigation of Commander Hollant, the conclusions reached by the Disposition Panel, and **his recommendation that no action be taken against Commander Hollant** based upon his conclusion that the allegations against Commander Hollant were not sustained.

63.     **Major Tim Belcher** then issued a Memorandum to Chief Eugene on June 8, 2017, and in it **recommended that Commander Hollant be demoted to the position of Sergeant**.

### *Gary Eugene Is Told To Tender His Resignation Or Be Fired*

64.     Chief Eugene went to the North Miami Police station on July 13, 2017, to turn in the doctor's note clearing him to return to work in full duty on Thursday, June 15, 2017. He then spoke to Personnel Director Joe Roglieri, Jr., to advise that he would be returning to work on June 15th.

65.     Personnel Director Roglieri called City Manager Spring to advise that Chief Eugene was returning to work the next day.

66.     The next day, on Wednesday, June 14th, Mr. Roglieri contacted Chief Eugene to

9

reconfirm that he was still returning to work on the 14th. He then advised that City Manager Spring wanted to see Chief Eugene in his office upon his return to work.

67.     Although the City of North Miami, City Manager Spring, and Assistant Chief Juriga knew that Chief Eugene was returning on Thursday, June 15, 2017, the City of North Miami nonetheless issued Commander Hollant a Notice advising on the afternoon of June 14, 2017 that his employment would be terminated.

68.     Chief Eugene returned from his leave of absence on June 15, 2017 and reported to City Manager Spring's office.

69.     City Manager Spring then told Chief Eugene that he had "decided to part ways, had a lot of respect for you, you have been very professional, and very competent, but we are moving in a new direction."

70.     City Manager Spring further told Chief Eugene that he is being placed on paid administrative leave and that he had 21 days to resign and accept $12,000 as a severance, and that if he did not accept the Separation Agreement and General Release appended hereto as Exhibit "A" and given to him on June 15, 2017, then his employment would be terminated on July 7, 2017.

71.     City Manager Spring appointed Chief Eugene with the approval of the City Council for the City of North Miami, but City Manager Spring did not receive prior approval of the City Council for the City of North Miami before to asking for Chief Eugene's resignation or prior to terminating Chief Eugene's employment.

72.     City Manager Spring told Chief Eugene during their encounter on June 15, 2017 that, upon inquiry, the public would be advised that Chief Eugene was "on vacation".

73.     Shortly thereafter, Councilman Galvin informed the public – including CBS 4 –

7300 N. Kendall Drive, Suite 450, Miami, FL 33156
TEL 305.230.4884   FAX 305.230.4844
brian@fairlawattorney.com www.fairlawattorney.com

that Chief Eugene was fired for giving conflicting statements under oath: "When you're a chief and you're giving contradictory information under oath both times, to two separate entities, it calls into question what's really happening." http://miami.cbslocal.com/2017/06/15/north-miami-police-chief-fired-charles-kinsey-shooting/.

74.     Chief Eugene then publicly advised that he would not allow the Defendant City to fire him on June 20, 2017.

75.     The Defendant City then held a public meeting on June 21, 2017 as part of its City Manager's Community Council.

76.     The Notice for the City Manager's Council Forum indicated that, "The objective for the City Manager's Community Form is to provide input as the City initiates measures to further enhance police community relations."

77.     At the public meeting, City Manager Spring authored a Memorandum that was disseminated to the public to purportedly update the community on the changes made since the July 18, 2016 shooting of Charles Kinsey.

78.     City Manager Spring discussed the changes that Defendant City made as a result of July 18, 2016 incident in which Mr. Kinsey was shot, which included various trainings for members of the police department in interacting with members of the community who have autism or other mental/capacity issues, use of body cameras, PERF, use of less-lethal weapon, Community Engagement training, and other improvements to the City of North Miami Police Department.

79.     Although most, if not all, of the changes that the City Manager identified were performed or taking place were initiated and/or performed by or through Chief Eugene, the City Manager gave no credit or mention to Chief Eugene for his accomplishments.

11

80.     Rather, the June 21, 2017 Memorandum distributed on behalf of the City Manager for the first time identified the (four) reasons why the City Manager decided to give Chief Eugene the ultimatum to either accept a severance package by 5:00 p.m. on July 6, 2017 or be fired on July 7, 2017.

81.     At no time prior to June 21, 2017 did the City of North Miami or City Manager Spring advise Chief Eugene of anything he is accused to have done, to permit Chief Eugene to present evidence or offer any response, nor to participate in any process regarding the termination of his employment.

82.     City Manager Spring then played selected portions of the two statements given by Chief Eugene, which City Manager Spring categorized as conflicting.

83.     Neither the City of North Miami nor City Manager Spring identified any reason(s) why they could or did not conduct a pre-determination hearing before taking any adverse employment actions against Chief Eugene.

84.     As a result of the shooting of Charles Kinsey, the City of North Miami and City Manager Spring have decided to terminate the employment of two high-ranking officers Haitian-American in the City of North Miami Police Department Command Staff.

85.     As a direct and proximate result of Defendants' actions, Chief Eugene's reputation, honor and integrity have been damaged in such a way as to brand him as a chief of police who lost his job and has effectively prevented him from following his trade and calling as a peace officer.

86.     The "reasons" given by the Defendant City and Defendant City Manager Spring were given as a pretext to masquerade the true reason(s) for the adverse employment actions taken against Chief Eugene.

7300 N. Kendall Drive, Suite 450, Miami, FL 33156
TEL 305.230.4884   FAX 305.230.4844
brian@fairlawattorney.com  www.fairlawattorney.com

87.     All conditions precedent occurred, were satisfied, and/or were waived.

88.     Chief Eugene hired the undersigned counsel and agreed to pay a reasonable fee for all services rendered herein.

### COUNT I – 42 U.S.C. §1983 PROCEDURAL DUE PROCESS VIOLATION AGAINST THE CITY OF NORTH MIAMI

Plaintiff, Gary Eugene, reincorporates and re-alleges all preceding paragraphs as though set forth fully herein and further allege as follows:

89.     Chief Eugene had a property right in his continued employment with the Defendant City, as guaranteed by the United States Constitution.

90.     The Fourteenth Amendment to the United States Constitution prohibits the Defendant City from depriving a person like Chief Eugene of liberty or property without due process of law.

91.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires, *inter alia*, that the Defendant City provide Chief Eugene with a pre-termination hearing or "…some opportunity for the employee to present his side of the case... before the termination takes effect." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985).

92.     The Due Process Clause also requires that the Defendant City provide Chief Eugene notice of any charges against him, an explanation of the Defendant City's evidence, and an opportunity for Chief Eugene to present his side of the story, and a meaningful hearing.

93.     On June 15, 2017, the Defendant City violated Chief Eugene's due process rights when it placed Chief Eugene on paid administrative leave until at 5:00 p.m. on July 6, 2017, after which time it would terminate (or has terminated) his employment.

13

94.     The Defendant City further gave Chief Eugene an ultimatum: either accept $12,000.00 and resign or be fired.

95.     The Defendant City failed in its obligation to give Chief Eugene notice of the reason for its taking adverse action(s) against him – including the removal of his authority and concluding with his dismissal – at or before taking employment action(s) against him.

96.     The Defendant City further failed in its obligation to give Chief Eugene an opportunity to be heard prior to its taking adverse employment action(s) against him.

97.     The Defendant City deprived the Chief of Police from receiving procedural due process with regard to any adverse employment action.

98.     As a result of the foregoing, the Defendant City deprived Chief Eugene of his property – in his continued employment – without a constitutionally adequate process.

99.     The Defendant City knew or reasonably should have known that its conduct would lead to the deprivation of Chief Eugene's constitutional rights by the City of North Miami.

100.    No event interrupted the Defendant City's decision to take any adverse employment action(s) against Chief Eugene, nor the taking of such action.

101.    As a direct and proximate result of the Defendant City's actions as aforesaid, Chief Eugene suffered damages in the form of the loss of his job, benefits, integrity, reputation, identity, and other damages.

WHEREFORE Plaintiff, Gary Eugene, demands the entry of a judgment in his favor and against Defendant, City of North Miami, after trial by jury, by determining and declaring that the Defendant City violated Chief Eugene's due process rights, reinstating him, awarding him damages, including for damages to his reputation, lost past and future wages and employment-related benefits, emotional distress damages, to have all offending information removed from his

14

personnel and internal affairs files, a hearing to have his file cleared attorneys' fees, costs, and all interest allowed by law.

## COUNT II – 42 U.S.C. §1983 LIBERTY INTEREST VIOLATION
## AGAINST THE CITY OF NORTH MIAMI

Plaintiff reincorporates and re-alleges paragraphs 1-88 as though set forth fully herein and further alleges as follows:

102.   The Fourteenth Amendment prohibits the Defendant City from depriving a person like Chief Eugene of liberty or property without due process of law.

103.   The concept of liberty recognizes two particular interests of a public employee: (a) the protection of his good name, reputation, honor and integrity, and (b) his freedom to take advantage of other employment opportunities.

104.   In connection with the termination of Chief Eugene's employment, the Defendant City made and disseminated several false statements of fact:

a)   That Chief Eugene made inconsistent statements under oath to the Florida Department of Law Enforcement investigator and to the Internal Affairs Investigator;

b)   That Chief Eugene lost managerial control over the police department;

c)   That Chief Eugene may have colluded with a police officer to circumvent the internal affairs investigation; and

d)   That Chief Eugene admitted to making hiring decisions based on outside influencers.

105.   The aforementioned statements are completely false and bear no relation to reality.

15

106.    The Defendant City has provided Chief Eugene no meaningful opportunity for a name clearing hearing.

107.    The false statements of fact identified above have cast a disparaging cloud over Chief Eugene's reputation for honesty and competency.

108.    As a direct and proximate result of the Defendant City's actions as aforesaid, Chief Eugene suffered damages in the form of the loss of his job, benefits, his identity, his reputation, suffered emotional distress, a blow to his reputation, and other damages.

WHEREFORE Plaintiff, Gary Eugene, demands the entry of a judgment in his favor and against Defendant, City of North Miami, after trial by jury, by determining and declaring that the Defendant City violated Chief Eugene's due process rights, awarding damages, including to his reputation, lost past and future wages and employment-related benefits, emotional distress damages, to have all offending information removed from his personnel and internal affairs files, a hearing to have his file cleared, attorneys' fees, costs, and all interest allowed by law.

## COUNT III – 42 U.S.C. §1983 DUE PROCESS VIOLATION
## AGAINST CITY MANAGER LARRY SPRING

Plaintiff, Gary Eugene, reincorporates and re-alleges paragraphs 1–88 as though set forth fully herein and further allege as follows:

109.    Chief Eugene had a property right in his continued employment with the Defendant City as guaranteed by the United States Constitution.

110.    The Fourteenth Amendment to the United States Constitution prohibits City Manager Spring from depriving a person like Chief Eugene of liberty or property without due process of law.

111.    The Due Process Clause of the Fourteenth Amendment to the United States

16

Constitution requires, *inter alia*, that City Manager Eugene provide Chief Eugene with a pre-termination hearing or "…some opportunity for the employee to present his side of the case... before the termination takes effect." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985).

112.    The Due Process Clause also requires that City Manager Spring provide Chief Eugene notice of the charges against him, an explanation of the Defendant City's evidence, and an opportunity for Chief Eugene to present his side of the story.

113.    City Manager Spring violated Chief Eugene's due process rights when he placed Chief Eugene on paid administrative leave until at 5:00 p.m. on July 6, 2017, after which time it would terminate (or has terminated) his employment.

114.    City Manager Spring further gave Chief Eugene an ultimatum: either accept $12,000.00 and resign or be fired.

115.    City Manager Spring failed in his obligation to give Chief Eugene notice of the reason for his taking adverse action(s) against him – including the removal of his authority and concluding with his dismissal – at or before taking employment action(s) against him.

116.    City Manager Spring employed no rule or ordinance that entitled Chief Eugene, as Chief of Police, to receive notice of any adverse employment action(s) against Chief Eugene and the reason(s) for such action at or before being subjected to any adverse employment action(s).

117.    City Manager Spring further failed in his obligation to give Chief Eugene an opportunity to be heard prior to its taking adverse employment action(s) against him.

118.    City Manager Spring enacted/employed no rule or ordinance that entitled Chief Eugene, as Chief of Police, to have a hearing prior to be subjected to any adverse employment

17

action(s).

119.    City Manager Spring thus deprived Chief Eugene of his property – in his continued employment – without a constitutionally adequate process.

120.    City Manager Spring knew or reasonably should have known that his conduct would lead to the deprivation of Chief Eugene's constitutional rights by the City of North Miami.

121.    No event interrupted the City Manager's decision to give Chief Eugene the ultimatum of resigning by 5:00 p.m. on July 6, 2017 or be fired by July 7, 2017.

122.    As a direct and proximate result of the Defendant City Manager's actions as aforesaid, Chief Eugene suffered damages in the form of the loss of his job, benefits, reputation, identity, and other damages.

WHEREFORE Plaintiff, Gary Eugene, demands the entry of a judgment in his favor and against Defendant, Larry Spring, after trial by jury, by determining and declaring that the Defendant City Manager Spring violated Chief Eugene's due process rights, reinstating him, awarding him damages, including for damages to his reputation, lost past and future wages and employment-related benefits, emotional distress damages, to have all offending information removed from his personnel and internal affairs files, a hearing to have his file cleared, attorneys' fees, costs, and all interest allowed by law.

### COUNT IV – 42 U.S.C. §1983 LIBERTY INTEREST VIOLATION
### AGAINST CITY MANAGER LARRY SPRING

Plaintiff reincorporates and re-alleges paragraphs 1-88 as though set forth fully herein and further alleges as follows:

123.    The Fourteenth Amendment prohibits the Defendant City from depriving a person like Chief Eugene of liberty or property without due process of law.

18

124.    The concept of liberty recognizes two particular interests of a public employee: (a) the protection of his good name, reputation, honor and integrity, and (b) his freedom to take advantage of other employment opportunities.

125.    Chief Eugene worked hard personally and professional to earn a stellar reputation in law enforcement in general during his career in public service, which began in 1985.

126.    In connection with the termination of Chief Eugene's employment, the Defendant City made and disseminated several false statements of fact:

127.    That Chief Eugene made inconsistent statements under oath to the Florida Department of Law Enforcement investigator and to the Internal Affairs Investigator;

128.    That Chief Eugene lost managerial control over the police department;

129.    That Chief Eugene may have colluded with a police officer to circumvent the internal affairs investigation; and

130.    That Chief Eugene admitted to making hiring decisions based on outside influencers.

131.    The aforementioned statements are completely false and bear no relation to reality.

132.    The Defendant City has provided Chief Eugene no meaningful opportunity for a name clearing hearing.

133.    The false statements of fact identified above

134.    As a direct and proximate result of the Defendant City Manager's actions as aforesaid, Chief Eugene suffered damages in the form of the loss of his job, benefits, identity, and other damages.

WHEREFORE Plaintiff, Gary Eugene, demands the entry of a judgment in his favor and

19

against Defendant, Larry Spring, after trial by jury, by determining and declaring that the Defendant City Manager Spring violated Chief Eugene's due process rights, awarding damages, including to his reputation, lost past and future wages and employment-related benefits, attorneys' fees, costs, and all interest allowed by law.

## COUNT IV – 42 U.S.C. §1983 LIBERTY INTEREST VIOLATION
## AGAINST SCOTT W. GALVIN

Plaintiff reincorporates and re-alleges paragraphs 1-88 as though set forth fully herein and further alleges as follows:

135.    The Fourteenth Amendment prohibits Defendant Galvin from depriving a person like Chief Eugene of liberty or property without due process of law.

136.    The concept of liberty recognizes two particular interests of a public employee: (a) the protection of his good name, reputation, honor and integrity, and (b) his freedom to take advantage of other employment opportunities.

137.    Chief Eugene worked hard personally and professional to earn a stellar reputation in law enforcement in general during his career in public service, which began in 1985.

138.    In connection with the termination of Chief Eugene's employment, the Defendant Councilman Galvin made and disseminated false statements of fact, to wit: that Chief Eugene made inconsistent statements under oath to the Florida Department of Law Enforcement investigator and to the Internal Affairs Investigator - *i.e.*, that he "lied".

139.    The aforementioned statement is completely false and bears no relation to reality.

140.    The Defendant Galvin made this statement to the CBS 4, in his official capacity, knowing that such statement would cause harm to Chief Eugene's personal and professional reputation with the intent of harming Chief Eugene's reputation and his ability to obtain future

20

employment.

141.    Defendant Galvin's statement to the public about Chief Eugene was knowingly false and/or made with reckless disregard for its truth/falsity, made with the intent to harm Chief Eugene's reputation and his ability to obtain future employment.

142.    Defendant Galvin's statement was made with the intent of injuring Chief Eugene and it did, in fact, injure Chief Eugene's reputation and has and will injure his ability to obtain future employment.

143.    As a direct and proximate result of the Defendant Councilman Galvin's actions as aforesaid, Chief Eugene suffered damages to his reputation for integrity, honesty, professionalism, and competency.

WHEREFORE Plaintiff, Gary Eugene, demands the entry of a judgment in his favor and against Defendant, Scott Galvin, after trial by jury, by determining and declaring that Defendant Galvin violated Chief Eugene's liberty interest rights, and awarding damages, including for damages to his reputation, attorneys' fees, costs, and all interest allowed by law.

## COUNT V – FMLA RETALIATION
## AGAINST CITY OF NORTH MIAMI

Plaintiff reincorporates and re-alleges paragraphs 1-88 as though set forth fully herein and further alleges as follows:

144.    The Defendant City granted Chief Eugene a FMLA leave of absence after he submitted all necessary paperwork to the satisfaction of the Defendant City pursuant to 29 U.S.C. §2601, *et seq.*

145.    Chief Eugene returned to work from his approved FMLA leave of absence on June 15, 2017.

7300 N. Kendall Drive, Suite 450, Miami, FL 33156
TEL 305.230.4884   FAX 305.230.4844
brian@fairlawattorney.com www.fairlawattorney.com

146.   Promptly upon returning to work for his approved Family Medical Leave Act leave of absence, as in the morning upon Chief Eugene's return to work at the Defendant City, his employment was terminated.

147.   At no time on or before July 15, 2017, did the Defendant City tell Chief Eugene any legitimate, non-retaliatory reason for the adverse employment action(s) taken against him.

148.   Because Chief Eugene exercised his rights under the Family Medical Leave Act, the Defendant City took adverse employment actions against him on the morning of June 15, 2017.

149.   This close temporal proximity (nearly simultaneous) of Chief Eugene's return and his being given an ultimatum on June 15, 2017 leaves no doubt about the motive for retaliating against him being the taking of Family Medical Leave for the adverse employment action(s) taken against Chief Eugene.

150.   And even though Assistant Chief Juriga made false statements to Chief Eugene and to City Manager Spring about Commander Hollant, the Defendant City took no adverse employment action against Assistant Chief Juriga.

151.   The Defendant City has no legitimate, non-retaliatory reason for taking any adverse employment action against Chief Eugene, let alone doing so **on the day** that he returned from an approved Family Medical Leave Act leave of absence.

152.   The FMLA precludes employers like the Defendant City from retaliating against employees like Chief Eugene who exercise the right to medical leave.

153.   As a direct and proximate result of the Defendant City retaliating against Chief Eugene for taking a medical leave by taking adverse employment actions against him through the termination of his employment, Chief Eugene suffered damages in the form of lost wages and

22

benefits, past and future.

154.    Chief Eugene is entitled to recover liquidated damages in an amount equal to the lost wages and benefits recovered from the Defendant City because its action were not taken in good faith and because it had no objectively reasonable grounds for taking such adverse actions against Chief Eugene.

WHEREFORE Plaintiff, Gary Eugene, demands the entry of a judgment in his favor and against Defendant, City of North Miami, after trial by jury, by determining and declaring that the Defendant City violated Chief Eugene's rights, reinstating his employment, awarding him damages, including lost past and future wages and employment-related benefits, liquidated damages in an amount equal to all damages awarded by the jury, emotional distress, to have all offending information removed from his personnel and internal affairs files, a hearing to have his file cleared, attorneys' fees, costs, and all interest allowed by law.

## COUNT V – PUBLIC WHISTLEBLOWER ACT CLAIM
## AGAINST CITY OF NORTH MIAMI

Plaintiff reincorporates and re-alleges paragraphs 1-88 as though set forth fully herein and further alleges as follows:

155.    The Defendant City is an "employer" as the term "employer" is defined by Fla. Stat. §112.3187.

156.    Chief Eugene was at all times material hereto an "employee" of the Defendant City as the term "employee" is defined in Fla. Stat. §112.3187.

157.    Section 112.3187, Florida Statutes, makes it unlawful for the Defendant City to take any adverse employment action against an employee like Chief Eugene for disclosing the acts of gross financial mismanagement as identified in paragraphs 46 through and including 49.

7300 N. Kendall Drive, Suite 450, Miami, FL 33156
TEL 305.230.4884   FAX 305.230.4844
brian@fairlawattorney.com www.fairlawattorney.com

158.    Chief Eugene satisfied the statutory requirement by disclosing his concerns to City Manager Spring about the Defendant City engaging in gross financial waste of public funds and about violating the rights of Commander Hollant as guaranteed by Fla. Stat. §112.532 and other laws, rules, regulations.

159.    The Defendant City took adverse employment actions against Chief Eugene starting on June 15, 2017, when he was placed on administrative leave, when it labeled him as a liar who had no operational control over the police department, and when it claimed that he made decisions based on improper influences.

160.    The Defendant City took these adverse employment actions against Chief Eugene as a direct and proximate result of his complaints about gross financial mismanagement / waste of public funds and about the Defendant City failing to follow the applicable laws, rules, and regulations governing the internal affairs investigation of Commander Hollant.

161.    As a direct and proximate result of the Defendant City's taking adverse employment actions described herein, Chief Eugene lost his job, past and future wages, benefits, and suffered emotional distress, negative commentary in his employment file and in the press, damage to his reputation, and other damages.

WHEREFORE Plaintiff, Gary Eugene, demands the entry of a judgment in his favor and against Defendant, City of North Miami, after trial by jury, by determining and declaring that the Defendant City violated Chief Eugene's rights, reinstating his employment, awarding him damages, including lost past and future wages and employment-related benefits, emotional distress damages, to have all offending information removed from his personnel and internal affairs files, a hearing to have his file cleared, attorneys' fees, costs, and all interest allowed by law.

7300 N. Kendall Drive, Suite 450, Miami, FL 33156
TEL 305.230.4884   FAX 305.230.4844
brian@fairlawattorney.com www.fairlawattorney.com

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury of all issues so triable.

Dated this 6th day of July 2017,

Respectfully Submitted,

FAIRLAW FIRM
7300 N. Kendall Drive
Suite 450
Miami, FL 33156
Tel:     305.230.4884
Fax:    305.230.4844


<u>s/*Brian H. Pollock, Esq.*</u>
Brian H. Pollock, Esq.
Fla. Bar No. 174742
brian@fairlawattorney.com

7300 N. Kendall Drive, Suite 450, Miami, FL 33156
TEL 305.230.4884   FAX 305.230.4844
*brian@fairlawattorney.com www.fairlawattorney.com*